UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x

SEMEN LEYKIN, on behalf of himself
and all others similarly situated,

                    Plaintiff,

          – against –

AT&T CORPORATION; COX
COMMUNICATIONS, INC.; COMCAST CABLE
COMMUNICATIONS, INC.; KLEINER
PERKINS CAUFIELD & BYERS; C. MICHAEL
ARMSTRONG; MARK McEACHEN; GEORGE
BELL; FRANK IANNA; MOHAN GYANI;
CHARLES H. NOSKI; DANIEL H. SOMERS;
JOHN C. PETRILLO; L. JOHN DOERR;
THOMAS A. JERMOLUK; WILLIAM R.
HEARST, III; RAYMOND LIGUORI; JOHN
C. MALONE; BRIAN L. ROBERTS; EDWARD
S. ROGERS; DAVID M. WOODROW; and
HOSSEIN ESLAMBOLCHI,

                    Defendants.

-------------------------------------x

02 Civ. 1765 (LLS)
AND ALL CONSOLIDATED
AND RELATED ACTIONS

**OPINION AND ORDER**

     In these consolidated and related securities class
actions, defendants move to dismiss the first amended (and
predecessor) complaints and the proposed third amended complaint
("PTAC"), which plaintiffs tender as their best statement of
"loss causation."

**FACTS**

     The facts set forth below are taken from the PTAC, the
documents referenced therein and publicly available financial

filings.  Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).
The facts are presumed to be true for purposes of this motion.
Papasan v. Allain, 478 U.S. 265, 283, 106 S. Ct. 2932,
2943 (1986).

## 1. At Home and its Proprietary Technology

In 1995, defendant Kleiner Perkins Caufield & Byers, a
venture-capital partnership, and Tele-Communications, Inc.
("TCI"), a cable television company, co-founded an Internet
services company named At Home Corporation.  At Home developed
and managed complex computer software and systems that enabled
customers with a personal computer and a cable modem to gain
access to the Internet at high speeds over existing television
cable lines (the "proprietary technology").  (PTAC ¶ 2(a),(b).)
It repeatedly represented that it regarded its technology as
proprietary and that it attempted to protect its rights therein.
Id. at ¶ 4.

## 2. At Home's Cable Partners

In 1996, TCI and two other cable companies, Cox
Communications, Inc. and Comcast Cable Communications, Inc.,
entered Master Distribution Agreements ("MDAs") with At Home,
which required them to use only At Home's service to provide
high-speed Internet access to their cable television subscribers
through June 4, 2002.  (PTAC ¶ 49.)  Pursuant to those
agreements, the cable companies paid At Home 35% of the average

$45 monthly subscription fee per customer to provide high-speed Internet access to those customers. Id. at ¶¶ 3, 49. In addition, Cox and Comcast each acquired stock in At Home and began offering At Home's high-speed Internet service to their cable television markets. Id. at ¶¶ 50, 52, 54(c).

In June 1998, AT&T Corporation announced that it would acquire TCI, including its controlling interest in At Home, in hopes of using At Home's proprietary technology to provide residential video, voice and data services on a single platform, something no other company had been able to do. Id. at ¶ 55. The merger was finalized in March 1999, and TCI was renamed AT&T Broadband, LLC. Id. at ¶ 58.

In December 1998, pursuant to an Indefeasible Right to Use Capacity Agreement ("IRU"), AT&T sold At Home the exclusive right to use AT&T's private fiber optic data network. The IRU enabled At Home to provide high-speed Internet service to millions of users without having to build its own network. Id. at ¶ 57. At Home and AT&T touted this agreement as enabling At Home to expand its services for years to come. Id.

**3. Misappropriation of At Home's Technology**

On November 8, 1999, the day before the start of the class period, At Home's stock price closed at $44.94. (PTAC ¶ 8.) However, that price did not reflect a secret plan AT&T had devised to duplicate At Home's network so it could provide high-

speed Internet service on its own. To carry out its scheme, between August 1999 and August 28, 2001 AT&T demanded, gained access to and copied all of At Home's proprietary technology, even though it had no contractual right to do so. Id. at ¶¶ 59(d),(h),(s), 110(b). AT&T also refused to make a non-disclosure or non-compete agreement with At Home. Id. at ¶ 87.

A significant element of AT&T's plan to misappropriate At Home's proprietary technology was a program known as Open Access, which was first announced on December 6, 1999. The ostensible purpose of the program was to offer AT&T's customers a choice between several Internet service providers, rather than only the At Home service. Id. at ¶¶ 59(k), 67. Although that choice was never actually offered during the class period, AT&T demanded that At Home turn over virtually all of its proprietary technology, stating that it was needed for tests in preparation for Open Access. In reality, AT&T's demands for At Home's proprietary technology went far beyond what was necessary to conduct such tests. Id. at ¶ 59(k). Those demands caused "many At Home employees to leave the Company for various reasons, specifically including the suspicion that AT&T was attempting, in reality, not to conduct any tests but to take At Home's proprietary technology" id. at ¶ 59(k)(1) as well as "tremendous dissent and distraction during At Home's board meetings for the remainder of At Home's existence." Id. at ¶ 59(k)(3).

The Open Access announcement did not disclose AT&T's misappropriation. Id. at ¶ 59(k). Indeed, the conversion of At Home's technology was never disclosed to the market during the class period. Id. at ¶ 86. Nor did AT&T's misappropriation of At Home's technology diminish the technology's usefulness. Id. at ¶ 6.

**4. March 2000 Agreements**

At Home made a series of agreements with AT&T, Cox and Comcast on March 28, 2000. The first was a control agreement whereby AT&T acquired all of Cox and Comcast's At Home stock in exchange for shares of AT&T. That gave AT&T a 74% voting interest and a 23% economic interest in At Home, as well as the ability to appoint a majority of its board. Cox and Comcast agreed to resign their seats on At Home's board. (PTAC ¶¶ 61(b), 70(b).)

The March 2000 Agreements also gave Cox and Comcast the option of terminating the exclusivity provisions of the 1996 MDAs with At Home, or the 1996 MDAs entirely, as early as June 2001--a year earlier than they were originally scheduled to expire. Id. at ¶ 61(c). Cox and Comcast also obtained the right to acquire components of At Home's technology, which would enable them to offer aspects of At Home's service themselves. Id. at ¶ 61(d).

AT&T, Cox and Comcast also represented that they would, as

promptly as practicable, execute new non-exclusive MDAs to govern their relationships with At Home through 2006. Despite those representations, no new MDAs were made. _Id._ at ¶¶ 59(t), 62, 75(e). In addition, Cox and Comcast, who together provided approximately 25% of At Home's revenues, _id._ at ¶ 75(c), informed At Home as early as September 2000 and April 2001, respectively, that they intended to provide high-speed Internet service themselves and end their relationships with At Home. _Id._ at ¶ 71-75, 102. On June 19, 2001, they each notified At Home that they would exercise their rights under the March 2000 agreements to terminate the exclusivity provisions of their 1996 MDAs, effective December 4, 2001. _Id._ at ¶ 102.

**5. Promethean Financing and IRU Recapture Agreement**

During the spring and summer of 2001, At Home was experiencing financial problems. (PTAC ¶ 98.) AT&T initially agreed to provide At Home with funding, but reneged when At Home refused to turn over more of its proprietary technology. _Id._ at ¶ 105. At Home was then forced to issue and sell $100 million of zero-percent five-year convertible secured notes in a private offering arranged by Promethean Capital Group, LLC on or about June 8, 2001 ("Promethean Financing"). _Id._ at ¶ 100. At Home was also forced to sell certain rights under the IRU back to AT&T on June 19, 2001 for $75 to $85 million, although At Home experts had determined that those rights had a fair market value

of approximately $130 million.  <u>Id.</u> at ¶¶ 89, 90.  At Home's

stock price declined from $3.92 on June 8, 2001 to $1.90 on June

19, 2001.  <u>Id.</u> at ¶ 100.

**6. At Home's Bankruptcy**

On July 23, 2001, At Home filed an S-3 Registration

Statement in connection with the Promethean Financing, which

stated "We will need to raise additional funds before the end of

2001 to support our business operations.  If we are unsuccessful

at raising funds, this could have a material adverse impact on

our operations and liquidity."  (PTAC ¶ 106.)

Less than a month later, At Home announced in its Form 10-

K/A filed on August 20, 2002 that there was "substantial doubt

about our ability to continue as a going concern" and that "We

cannot guarantee that we will be able to obtain additional

funding on acceptable terms, if at all."  <u>Id.</u> at ¶ 107.  On

August 30, 2001, At Home announced that it could not repay the

Promethean loan due the next day.  <u>Id.</u> at ¶ 109.  On September

28, 2001, At Home sold substantially all of its Internet

business assets to AT&T and filed for bankruptcy.  <u>Id.</u> at ¶

110(a),(b).  By that date, the price of At Home's stock had

fallen to $0.15.  (Winter Sept. 6, 2005 Aff. Ex. 28.)

Finally, in December 2001, At Home stopped servicing AT&T

pursuant to a bankruptcy court order and AT&T stopped paying At

Home.  (PTAC ¶ 111.)  AT&T then canceled its September 28, 2001

purchase of At Home's assets. Id. With the use of At Home's proprietary technology it had finished taking three months earlier, AT&T then began servicing customers on its own network, which today services both Cox and AT&T Broadband/Comcast[1] subscribers. Id. at ¶¶ 6, 111.

## PROCEDURAL HISTORY

On November 7, 2002, plaintiffs filed a consolidated class action complaint asserting claims under Section 10(b) of the Securities Exchange Act ("Exchange Act"), Rule 10b-5 promulgated thereunder and control person liability under Section 20(a) of the Exchange Act against numerous defendants.[2] The consolidated complaint also asserted claims of common law fraud and breaches of fiduciary duties, which were dismissed in September 2003 as

---

[1] Comcast merged with AT&T Broadband on December 19, 2001. (PTAC ¶ 112.)

[2] The defendants named in the PTAC are Mark McEachen, George Bell and John C. Malone (the "At Home defendants"), AT&T Corporation, C. Michael Armstrong, John C. Petrillo, Daniel H. Somers, Mohan Gyani, Frank Ianna, Charles H. Noski, Raymond Liguori and Hossein Eslambolchi (the "AT&T defendants"), Kleiner Perkins Caufield & Byers, L. John Doerr, William R. Hearst, III and Thomas A. Jermoluk (the "Kleiner Perkins defendants"), Comcast Cable Communications, Inc. and Brian L. Roberts (the "Comcast defendants"), Cox Communications, Inc. and David M. Woodrow (the "Cox defendants") and Edward S. Rogers. The individual defendants were all directors or officers, or both, of At Home and (except for Eslambolchi) are alleged to be control persons of At Home. (PTAC ¶ 16-36.)

preempted by the Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. § 78bb(f)(1). The same order also dismissed, as mere puffery, several statements alleged as bases for liability.

On February 24, 2004, plaintiffs filed a first amended consolidated class action complaint, which added a claim under Section 14(a) of the Exchange Act alleging misrepresentations and omissions in At Home's May 26, 2000 Proxy Statement. That claim, and certain control person claims, were dismissed by order dated August 9, 2004.

By order dated March 10, 2005, a class was certified of all persons and entities that purchased the common stock of At Home during the period March 28, 2000 through September 28, 2001.

On May 31, 2005, plaintiffs moved for leave to file a second amended consolidated complaint to comply with recently decided cases addressing the issue of loss causation, and to extend the class period back to November 9, 1999. At a conference on July 8, 2005, plaintiffs were directed to file a proposed third amended complaint (the PTAC) setting forth their best possible allegations of loss causation.

On August 5, 2005, plaintiffs moved to file the PTAC, which asserts claims under Section 10(b) against defendants AT&T, Armstrong, McEachen, Noski, Somers and Petrillo, as well as control person claims against all defendants under Section 20(a) premised on primary violations of Section 10(b) by At Home.

Defendants move to dismiss the first amended complaint, and oppose the filing of the second and proposed third amended complaints. They argue, among other things, that AT&T's scheme was not in connection with the purchase or sale of any security, that plaintiffs have not adequately pled loss causation, and that no fraudulent acts took place during the proposed extended class period.[3]

**LEGAL STANDARDS**

**1. Motion to Dismiss**

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court's function is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The court must accept the plaintiff's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor. Papasan, 478 U.S. at 283. Thus, a complaint may be dismissed only where "it appears beyond doubt that the plaintiff

_____

[3] Plaintiffs seek to extend the class period because At Home's representations that it possessed and protected proprietary technology, and the AT&T defendants' misappropriation thereof, began before March 28, 2000. Because plaintiffs do not adequately plead a securities fraud arising from either of those claims, the issue whether extending the class period is warranted need not be addressed.

can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957). In deciding a motion to dismiss, the court may consider exhibits to the complaint, documents incorporated in the complaint by reference, and matters of which judicial notice may be taken, such as public disclosure documents that are required by law to be, and have been, filed with the SEC. Kramer v. Time Warner, Inc., 937 F.2d 767, 773-74 (2d Cir. 1991).

## 2. Section 10(b) of the Exchange Act and Rule 10b-5

The majority of claims asserted under Rule 10b-5,[4]

---

[4] Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact, or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

promulgated under Section 10(b) of the Exchange Act,[5] are brought
under subparagraph (b), which prohibits fraudulent misstatements
or omissions. To state a claim under that provision, a
plaintiff must show that the defendant "(1) made misstatements
or omissions of material fact; (2) with scienter; (3) in
connection with the purchase or sale of securities; (4) upon
which plaintiffs relied; and (5) that plaintiffs' reliance was
the proximate cause of their injury." Lentell v. Merril Lynch &
Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005), cert. denied, __
U.S. __, 126 S. Ct. 421, 163 L. Ed. 2d 321 (2005).

In addition, the Private Securities Litigation Reform Act
of 1995 ("PSLRA") requires that a complaint alleging misleading
statements or omissions under Section 10(b) "specify each

---

[5] Section 10 of the Exchange Act provides, in pertinent part:

> It shall be unlawful for any person,
> directly or indirectly, by the use of any
> means or instrumentality of interstate
> commerce or of the mails, or of any facility
> of any national securities exchange--
>
> . . .
>
> (b) To use or employ, in connection
> with the purchase or sale of any security
> registered on a national securities exchange
> or any security not so registered, . . . any
> manipulative or deceptive device or
> contrivance in contravention of such rules
> and regulations as the Commission may
> prescribe as necessary or appropriate in the
> public interest or for the protection of
> investors.

15 U.S.C. § 78j.

statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Similarly, Federal Rule of Civil Procedure 9(b)[6] requires that a complaint alleging fraud: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993).

Though often conflated with subparagraph (b), the more general provisions of subparagraphs (a) and (c) of Rule 10b-5 do not require a misstatement or omission. To make out a claim under those provisions, plaintiffs must allege that "(1) they were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter." In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281, 385 (S.D.N.Y. 2003).

---

[6] Rule 9(b) provides that "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b).

**Loss Causation**

All private plaintiffs asserting securities fraud claims under Section 10(b) or Rule 10b-5 "must prove that the defendant's fraud caused an economic loss." <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 125 S. Ct. 1627, 1629 (2005). The common law loss causation requirement was codified in the PSLRA: "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

The causation element of Rule 10b-5 has two separate elements: "a plaintiff must allege both transaction causation, *i.e.*, that *but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.*, that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." <u>Suez Equity Investors, L.P. v. Toronto-Dominion Bank</u>, 250 F.3d 87, 95 (2d Cir. 2001).

Plaintiffs must show that the defendants' fraud caused their losses because the securities statutes make private securities fraud actions available, "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually

cause." <u>Dura</u>, 125 S. Ct. at 1633; <u>cf</u>. <u>Castellano v. Young &</u>
<u>Rubicam, Inc.</u>, 257 F.3d 171, 186 (2d Cir. 2001) ("The loss
causation requirement is intended to 'fix a legal limit on a
person's responsibility, even for wrongful acts.'"), quoting
<u>First Nationwide Bank v. Gelt Funding Corp.</u>, 27 F.3d 763, 769
(2d Cir. 1994).

In <u>Dura</u>, the Supreme Court stated that a plaintiff who has
suffered an economic loss must plead "some indication of the
loss and the causal connection that the plaintiff has in mind."
125 S. Ct. at 1634. Allegations that the plaintiff purchased
shares at an artificially inflated price do not, without more,
plead loss causation. <u>Id</u>.[7]

---

[7] Plaintiffs continue to rely on my September 17, 2003 opinion,
which sustained their loss causation allegations on an inflated
purchase price theory:

> that because of the defendants' failure to
> disclose their planned misappropriation of
> At Home's valuable proprietary technology,
> plaintiffs paid more than the fair value of
> At Home stock when they purchased it. On
> that theory, the loss is that increment of
> the market price representing the market's
> ignorance of the undisclosed facts, and the
> loss was caused by purchase of the stock at
> the market price.

<u>Leykin v. AT&T Corp.</u>, No. 02 Civ. 1765 (LLS) (S.D.N.Y. Sept. 17,
2003), at * 2; (Pl. Reply at 4.) However, that opinion predated
<u>Dura</u>, which states:

> [T]he logical link between the inflated
> share purchase price and any later economic
> loss is not invariably strong. Shares are
> normally purchased with an eye toward a
> later sale. But if, say, the purchaser

The Court of Appeals explained in <u>Lentell</u>, that to establish loss causation:

> 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' <u>Suez Equity Investors, L.P. v. Toronto-Dominion Bank</u>, 250 F.3d [at 95], *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise, the loss in question was not foreseeable.

396 F.3d at 173 (emphasis in <u>Lentell</u>).

"Loss causation" in this setting is concerned less with the misrepresentation which fooled the victim into the transaction, and more with whether it was the concealed or misrepresented fact which caused the harm. "A foreseeable injury at common law is one proximately caused by the defendant's fault, but it

---

> sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.

125 S. Ct. at 1631-32. Thus, that portion of my September 17, 2003 opinion is no longer good law.

cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated." Id. at 173. "Put another way, a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." Id. (emphasis in original).

Thus, the first step in analyzing whether a complaint alleging securities fraud adequately pleads loss causation is to identify the subject of the misrepresentations or omission that allegedly caused plaintiff's loss, *i.e.*, the risk concealed by defendant's fraud. See In re Initial Public Offering Sec. Litig., 399 F. Supp. 2d 298, 307 (S.D.N.Y. 2005) ("It is vital to understand the nature of the risks that plaintiffs in the instant action allege were concealed.").

The second step is to determine whether the complaint alleges that the concealed risk led to plaintiff's loss. "If that relationship is sufficiently direct, loss causation is established, but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." Lentell, 396 F.3d at 174 (internal quotations and citations omitted).

A concealed risk can lead to a decline in stock price either because a corrective disclosure reveals the falsity of the misrepresentations or omissions, or because the risk which was concealed materializes and causes the price decline. See In re Initial Public Offering Sec. Litig., 399 F. Supp. 2d at 307 ("Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss. By contrast, where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed—i.e., a corrective disclosure."); In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 305–307 (S.D.N.Y. 2005) (loss causation can be pled by alleging either a corrective disclosure or the materialization of a concealed risk).

## DISCUSSION

Six sets of allegedly fraudulent acts can be distilled from the PTAC: (1) the AT&T defendants' scheme to misappropriate At Home's proprietary technology and otherwise impede At Home's business, (2) At Home's misrepresentations that it possessed and protected valuable proprietary technology and its nondisclosure of AT&T's misappropriation, (3) At Home's false financial

statements and exaggerated subscriber growth projections, (4) defendant McEachen's misrepresentations regarding At Home's performance, (5) fraudulent acts and omissions related to the March 2000 agreements, and (6) misrepresentations concealing Cox and Comcast's intentions to stop doing business with At Home.

## 1. The AT&T Defendants' Scheme

Plaintiffs claim that the AT&T defendants violated Section 10(b) and Rule 10b-5(a) and (c) by engaging in a fraudulent scheme to misappropriate At Home's technology, diminish its profits and impair its ability to raise capital. According to the PTAC, the scheme was carried out in the following ways:

- AT&T announced the Open Access program, which would allow customers to choose Internet Service Providers other than At Home. AT&T then used tests to prepare for Open Access as a pretext to take At Home's proprietary technology. (PTAC ¶¶ 59(f),(k),(t), 60.)

- AT&T appointed defendant Eslambolchi and others to At Home's management to pressure its engineers into divulging more of At Home's proprietary technology, which created a 'fear set' among At Home's employees, diminished their productivity and caused some to leave the company. Id. at ¶¶ 59(k), 81, 83(c), 94.

- AT&T forced At Home to spend $45 million over budget on computer equipment. Id. at ¶ 91(b).

- AT&T prevented At Home from charging AT&T subscribers for certain licenses, thereby diminishing AT&T's revenues. Id. at ¶ 91(d).

- AT&T prevented At Home from forming a beneficial partnership or obtaining advantageous financing, forcing At Home to enter the Promethean Financing that led to its financial collapse. Id. at ¶¶ 100, 103.

The AT&T defendants argue that the alleged scheme was not "in connection with the purchase or sale of any security" as both Section 10(b) and Rule 10b-5 require.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  Plaintiffs respond that "At Home's proprietary technology was the key to the value of its stock and the undisclosed scheme clearly related to (and destroyed) the investment value of and price of At Home Stock."  (Pl. Mem. Supp. Mot. Leave to File a Third Am. Compl. ("Pl. Mem.") at 22-23.)

Not all conduct that negatively affects a company's stock price is actionable as a federal securities fraud.  The scheme to defraud must coincide with the sale of securities.  SEC v. Zandford, 535 U.S. 813, 822, 122 S. Ct. 1899, 1904 (2002).  In other words, the fraud itself must be "integral to the purchase and sale of the securities in question."  Pross v. Katz, 784 F.2d 455, 459 (2d Cir. 1986), quoted in Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 395 F.3d 25, 37 (2d Cir. 2005), rev'd on other grounds, No. 04-1371, 2006 U.S. LEXIS 2497 (U.S. March 21, 2006).  Conduct that is merely incidental or tangentially related to the sale of securities will not meet the "in connection with" requirement.  Ling v. Deutsche Bank, AG, No. 04 Civ. 4566 (HB), 2005 U.S. Dist. LEXIS 9998, at *14 (S.D.N.Y. May 26, 2005).

Indeed, "courts repeatedly have found that allegations constituting nothing more than assertions of general mismanagement, or nondisclosures of mismanagement, cannot support claims under § 10(b) of the Exchange Act". Portannese v. Donna Karan Int'l, Inc., No. 97 Civ. 2011 (CBA), 1998 WL 637547, at *9 (E.D.N.Y. Aug. 14, 1998); cf. Suez Equity, 250 F.3d at 99 ("Post-stock-purchase corporate mismanagement or breach of fiduciary duty may be just as reprehensible as a misleading statement regarding the value of a security to be sold, but the former is not proscribed by § 10(b), while the latter is actionable."); Arduini/Messina P'ship v. Nat'l Med. Fin. Serv. Corp., 74 F. Supp. 2d 352, 362 (S.D.N.Y. 1999) (allegations of corporate mismanagement and breach of fiduciary duties might support a derivative claim but cannot provide the basis for a securities fraud claim) (collecting cases).

In Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540 (2d Cir. 1967), the Court of Appeals dismissed a claim similar to the scheme alleged here. Minority shareholders claimed, among other things, that the majority shareholders ran the company in their own interests rather than the company's, by diverting company assets to themselves. Id. at 542. The court held that those allegations "are primarily corporate abuse and diversion, claims cognizable under state law but not under the [Exchange] Act." Id. at 546. As in Mutual Shares, the scheme alleged here

involved corporate abuse, misconduct and diversion of assets, but no transactions in the relevant securities.[8]  Its success depended on the misappropriation of At Home's proprietary technology, without regard to any transactions in At Home stock.

The PTAC does allege that in March 2000 AT&T increased its control over At Home by acquiring At Home shares from Cox and Comcast in exchange for AT&T shares.  However, an otherwise legitimate stock transaction that is antecedent, but not integral, to the alleged fraud does not meet the "in connection with" requirement.  See Zandford, 535 U.S. at 820 (neither an otherwise legitimate securities transaction that is an independent event from the alleged fraud, or is merely followed by the theft of the proceeds of the transaction, supports a claim under Section 10(b)).  Indeed, the defendants in Mutual

---

[8] The Mutual Shares court sustained a separate claim that the majority stockholders manipulated the market price of the stock by reducing dividends in order to force minority stockholders to sell at depressed values.  384 F.2d at 547.  That scheme involved market manipulation and is therefore different from the scheme alleged here.  As the Supreme Court has explained, manipulation is:

> 'virtually a term of art when used in connection with securities markets.' Ernst & Ernst [v. Hochfelder, 425 U.S. 185, 199, 96 S. Ct. 1375, 1384 (1976)].  The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.

Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476, 97 S. Ct. 1292, 1302 (1977).  Plaintiffs do not allege that defendants affected market activity in At Home stock in such a way.

Shares, like AT&T here, acquired a controlling position in the issuer before carrying out their scheme, 384 F.2d at 542, but the Court of Appeals nevertheless dismissed plaintiffs' claim based on the subsequent diversion of assets from the issuer. Id. at 546.

The cases upon which plaintiffs rely do not support the imposition of liability under Section 10(b) for the AT&T defendants' scheme. In those cases, defendants either made materially false or misleading statements upon which investors relied in purchasing or selling securities,[9] or actually traded in securities as part of the fraud.[10] Here, the alleged scheme

_____

[9] See Semerenko v. Cendant Corp., 223 F.3d 165 (3d Cir. 2000); In re Ames Dep't Stores, Inc. Sec. Litig., 991 F.2d 953 (2d Cir. 1993); SEC v. Rana Research, 8 F.3d 1358 (9th Cir. 1993); Int'l Monetary Exchange v. First Data Corp., 63 F. Supp. 2d 1261, 1265 (D. Colo. 1999); In re Leslie Fay Cos. Sec. Litig., 871 F. Supp. 686, 697 (S.D.N.Y. 1995).

[10] See Zandford, 535 U.S. at 815 (broker sold customer's securities without authorization and embezzled the proceeds); Superintendent of Ins. of the State of N.Y. v. Bankers Life and Cas. Co., 404 U.S. 6, 7–8, 92 S. Ct. 165, 166–67 (1971) (defendants purchased stock with company assets); SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 181, 84 S. Ct. 275, 277 (1963) (defendant recommended securities for long term investment to raise the market price and increase his own profits on sales of the securities); Press v. Chem. Inv. Servs. Corp., 166 F.3d 529 (2d Cir. 1999) (seller of Treasury bond failed to disclose that it would withhold interest and take a commission from the proceeds); SEC v. Santos, 355 F. Supp. 2d 917 (N.D. Ill. 2003) (bribery scheme involved investing in particular securities).

did not involve the trading of At Home shares and, as discussed below, the alleged misrepresentations and omissions themselves could not have caused a drop in At Home's stock price.

In sum, plaintiffs' claims based on the AT&T defendants' scheme itself are dismissed as representing charges of corporate mismanagement and abuse rather than of securities fraud.[11]

## 2. At Home's Misrepresentations Regarding its Proprietary Technology

At Home repeatedly stated in its public filings that:

> We regard our intellectual property, including our patents, copyrights, trademarks, trade secrets, and similar intellectual property as critical to our success. We rely upon patents, trademark and copyright law, trade secret protection and confidentiality or license agreements to protect our proprietary rights. Effective protection of intellectual property may not be available in every country in which our products and services are available. We cannot guarantee that the steps we have taken to protect our proprietary rights will be adequate.

At Home's Form S-3 (filed November 16, 1999) at 10, Prichard

---

[11] Claims were brought in California State court by At Home bondholders alleging that "AT&T breached fiduciary duties it owed At Home including by misappropriating At Home's proprietary information and trade secrets to build an AT&T high-speed Internet access Network to replace the At Home Network." (PTAC ¶¶ 55, 59(e).) AT&T agreed to settle the claims for $400 million. (Pl.'s counsel's June 3, 2005 and July 8, 2005 letters to Court.)

Sept. 1, 2005 Decl. Ex. 3. Plaintiffs claim that statement, and others like it,[12] were rendered misleading by AT&T's misappropriation of At Home's proprietary technology, that the failure to disclose the taking was a material omission, and that those misrepresentations and omissions artificially inflated the price of At Home stock. Defendants argue that plaintiffs do not, and cannot, show that such misstatements and omissions caused At Home's stock price to fall.

Such a showing might be made if there were facts indicating that the market had learned of the AT&T defendants' intentions during the class period, or that the AT&T defendants had gained access to, copied and used At Home's proprietary technology to

---

[12] The same language was reprinted in At Home's Form S-3/A (filed December 14, 1999) at 10, Prichard Sept. 1, 2005 Decl. Ex. 4, Form S-3/A (filed January 4, 2000) at 8, Prichard Sept. 1, 2005 Decl. Ex. 5, Form 10-K (filed March 30, 2000) at 23, Prichard Sept. 1, 2005 Decl. Ex. 6, and Form 10-K/A (filed April 28, 2000) at 25, Prichard Sept. 1, 2005 Decl. Ex. 7. See also At Home's Form 10-K (filed March 30, 2000), quoted at PTAC ¶ 65(a) ("We regard our technology as proprietary and we attempt to protect it under copyrights, trademarks, trade secret laws, restrictions on disclosure and transferring title and other methods, and we have been issued patents with respect to certain aspects of our searching and indexing technology."); At Home's Form 10-K/A (filed April 28, 2000), quoted at PTAC ¶ 65(a) (same); At Home's Form 10-K (filed April 2, 2001) at 13, quoted at PTAC ¶ 96 (same and adding: "We also generally enter into confidentiality or license agreements with our employees and consultants, and generally control access to and distribution of our documentation and other proprietary information. Despite these precautions, it may be possible for a third party to copy or otherwise obtain and use our services or technology without authorization, or to develop similar technology independently.").

compete with At Home.  No such facts are alleged.

**No Corrective Disclosure**

Despite numerous assertions that "subsidiary parts or risks" of the AT&T defendants' scheme were disclosed (PTAC ¶ 118), the PTAC does not allege facts showing that, during the class period, the market became aware of the AT&T defendants' misappropriation of At Home's proprietary technology.  On the contrary, plaintiffs acknowledge that the AT&T defendants' taking did not become public knowledge during the class period. Id. at ¶ 59(t) ("Pursuant to the undisclosed scheme, AT&T took a number of steps which enabled AT&T to copy At Home's technology. Some of their steps were disclosed to the public albeit the scheme, the takings, and the purpose of each step to enable AT&T to take At Home's technology were never disclosed.").  Thus, the PTAC does not allege that a corrective disclosure caused At Home's stock price to decline.  See Lentell, 396 F.3d at 175 n.4 ("These allegations do not amount to a corrective disclosure, however, because they do not reveal to the market the falsity of the prior recommendations.  . . .  Merrill's concealed opinions regarding 24/7 Media and Interliant stock could not have caused a decrease in the value of those companies before the concealment was made public."); In re Worldcom Inc. Sec. Litig., No. 02 Civ. 3288 (DLC), 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17,

2005) ("A concealed fact cannot cause a decrease in the value of a stock before the concealment is made public.").

**No Materialization of the Concealed Risk**

According to the PTAC, the AT&T defendants began copying At Home's proprietary technology by August or September 1999 (PTAC ¶ 59(d)), began designing their own network by October 1999, id. at ¶ 59(i), and had finished taking all of At Home's proprietary technology by August 28, 2001, id. at ¶ 110(b). However, "AT&T's secret conversion of At Home's proprietary technology did not diminish the usefulness and general potential of such technology." Id. at ¶ 6.

It was not until December 2001 that AT&T's own network became operational and began servicing At Home's former customers. Id. at ¶ 111. That was more than a month after At Home had filed for bankruptcy, its stock had lost nearly all of its value, and, most importantly, the class period had ended.

Because the PTAC does not allege that, during the class period, At Home faced competition from its stolen technology, or that At Home's use of the technology was impaired by AT&T's misappropriation, it makes no showing that the concealed risk materialized so as to cause At Home's stock price to fall.

**3. At Home's Financial Statements and Subscriber Projections**

The PTAC alleges that, beginning with At Home's 10-Q filed on November 14, 2000, and continuing through 2001, At Home:

- understated accounts payable by as much as $20 million,

- overstated total stockholders' equity by as much as $100 million,

- overstated the value of its assets by as much as $80 million,

- inflated its projected number of subscribers, upon which its estimated revenues and financial performance were based,

- concealed the fact that up to $40 million in accounts payable were withheld from At Home by Cox and Comcast in 2001, and

- concealed the fact that At Home's revenues were reduced by AT&T's refusal to allow At Home to charge AT&T customers certain network usage fees. (PTAC ¶¶ 69, 91-92.)

Defendants argue that those claims must also be rejected for failure to plead loss causation.

**No Corrective Disclosure**

Plaintiffs point to At Home's Form S-3 Registration Statement filed on July 23, 2001, which stated "We will need to raise additional funds before the end of 2001 to support our business operations" and warned that failure to do so could "have a material adverse impact on our operations and liquidity" (PTAC ¶¶ 106, 118(J)), At Home's Form 10-K/A filed August 20, 2001 which announced "substantial doubt about our ability to continue as a going concern" and that At Home "cannot guarantee that we will be able to obtain additional funding on acceptable terms, if at all" (PTAC ¶ 107), and the announcements of the Promethean Financing and At Home's bankruptcy filing. (Pl. Mem. Supp. Leave to Amend and Opp. Def. Mot. Dismiss ("Pl. Reply") at

93-94.)

As dire as those statements were, and as grave as the Promethean Financing and bankruptcy filing turned out to be, nothing in those statements disclosed that the alleged misrepresentations had been false or misleading. They did not reveal to the market any misstatements in At Home's prior financial reports or subscriber projections. See Lentell, 396 F.3d at 175 n.4; In re Tellium, Inc. Sec. Litig., No. 02 Civ. 5878 (FLW), 2005 WL 2090254, at *4 (D.N.J. Aug. 26, 2005) ("Dura itself makes clear that loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud.").

**No Materialization of the Concealed Risk**

In their reply brief, plaintiffs seem to argue that the risk concealed by those misrepresentations materialized when At Home experienced a liquidity crisis in July 2001, forcing it to engage in the Promethean Financing and ultimately file for bankruptcy.

Defendants respond that the first allegedly fraudulent financial report, At Home's Form 10-Q filed November 14, 2000, disclosed that At Home might not be able to obtain financing:

> We intend to make investments in our
> infrastructure of approximately $250 million
> during 2000, including investments in our
> network designed to provide stability and
> scalability. Of this amount, we had

> invested $199.6 million during the nine
> months ended September 30, 2000, including
> purchases of property, equipment and
> improvements, payments on capital lease
> obligations and payments under our backbone
> agreement. We believe that we have
> sufficient liquidity to continue to support
> such investments, to meet the commitments
> described below and to fund our operating
> needs for at least the next 12 months.
> However, it is possible that we could
> experience unexpected costs and expenses
> with respect to these or other items.
> Thereafter, if cash generated by operations
> is insufficient to satisfy our liquidity
> requirements, we may need to seek
> alternative financing, such as selling
> additional equity or debt securities or
> obtaining additional credit facilities.
> However, depending on market conditions, we
> may consider alternative financing even if
> our financial resources are adequate to meet
> presently anticipated business requirements.
> Financing may not be available on terms
> acceptable to us or at all. The sale of
> additional equity or convertible debt
> securities may result in additional dilution
> to our stockholders.

At Home's Form 10-Q (filed Nov. 14, 2000) at 27, Brusca Decl.

Ex. 18.

Defendants also argue that the downturn in the stock market

for Internet-related companies, rather than any firm-specific

financial misrepresentations, caused At Home's stock to

collapse. They point out that, like At Home's stock, both

market-wide and industry-specific stock indices declined

dramatically between March 2000 and September 28, 2001.[13]   The

companies tracked by BUSNICS and BUSNISE, like At Home, provide

Internet content and services.   PTAC ¶ 2(b), Pl. Reply at 50

n.17.   In addition, At Home's stock performance mimicked those

indices remarkably closely, especially after the alleged

misrepresentations first appeared in November 2000.

      In <u>Lentell</u>, the court stated that:

> where (as here) substantial indicia of the
> risk that materialized are unambiguously
> apparent on the face of the disclosures
> alleged to conceal the very same risk, a
> plaintiff must allege (i) facts sufficient
> to support an inference that it was
> defendant's fraud--rather than other salient
> factors--that proximately caused plaintiff's
> loss; or (ii) facts sufficient to apportion
> the losses between the disclosed and
> concealed portions of the risk that
> ultimately destroyed an investment.

396 F.3d at 177.

      As a general proposition, whether "the loss was caused by

an intervening event, like a general fall in the price of

Internet stocks . . . is a matter of proof at trial and not to

be decided on a Rule 12(b)(6) motion to dismiss."   <u>Emergent</u>

---

[13] <u>See</u> AT&T Mem. Opp. Mot. Leave to File Third Am. Compl. ("AT&T Mem.") at 8 n.11 (from March 27, 2000 to September 28, 2001, At Home's stock price declined 99.54%, the NASDAQ Composite Index (on which At Home stock was traded) declined 69.77%, the DJINET (Dow Jones Internet Composite Index) declined 91.52%, the BUSNICS (Bloomberg US Internet Connectivity Services Index) declined 99.13% and the BUSNICE (Bloomberg US Internet Content Entertainment Index) declined 89.7% from March 27, 2000 to August 29, 2001, when it was suspended); Winter Sept. 2, 2005 Aff. Ex. 20-30; Prichard Sept. 1, 2005 Aff. Ex. 14-21.

<u>Capital</u>, 343 F.3d at 197.  However,

> "when the plaintiff's loss coincides with a
> marketwide phenomenon causing comparable
> losses to other investors, the prospect that
> the plaintiff's loss was caused by the fraud
> decreases," and a plaintiff's claim fails
> when "it has not adequately ple[]d facts
> which, if proven, would show that its loss
> was caused by the alleged misstatements as
> opposed to intervening events."

<u>Lentell</u>, 396 F.3d at 174, quoting <u>First Nationwide Bank</u>, 27 F.3d
at 772.

The only allegation in the PTAC of a causal link between
the alleged misrepresentations and the liquidity crisis is: "If
the true subscriber growth and prospects had been as
represented, At Home would have had more financial strength and
would not have had to file for bankruptcy as it did."  (PTAC ¶
92(b).)  Such an assertion is too general and conclusory to
support an inference that defendants' fraud proximately caused
the decline in stock prices.  <u>See</u> <u>In re The Waranco Group, Inc.</u>
<u>Sec. Litig. (II)</u>, 388 F. Supp. 2d 307, 318 (S.D.N.Y. 2005)
(unsupported assertion that "Waranco's true undisclosed
financial condition rendered Waranco unable to obtain waivers"
from its creditors did not support an inference that defendant's
fraud proximately caused plaintiff's stock market loss).  The
PTAC does not allege facts showing that it was the claimed
concealment which caused plaintiffs' losses, rather than the

market-wide Internet stock collapse,[14]--nor any way to separate the effect of the misstatements (if there was any) from the general collapse or other causes. Thus, there is no effective pleading of a loss caused by those misrepresentations. <u>See</u> <u>Lentell</u>, 396 F.3d at 174, 177. The claims based on At Home's financial statements and subscriber projections must therefore be dismissed.

**4. McEachen's Statements Regarding At Home's Performance**

The PTAC alleges that Mr. McEachen, At Home's chief financial officer, misrepresented At Home's financial prospects. In a January 25, 2001 Bloomberg interview, he stated that "The first quarter will be by far the low-water mark for our financial performance in 2001" (PTAC ¶ 92(a)(1)) and in a June 19, 2001 investor conference call he stated that "by getting the $185 Million [from the Promethean Financing and the IRU recapture agreement] in the till, it allows us to not have to worry in the near term about financing" (PTAC ¶ 101). Those statements are dismissed as bases for liability because they are mere generalized expressions of puffery and optimism, which are

---

[14] In fact, the PTAC elsewhere alleges that At Home's liquidity crisis was caused by the fact that AT&T obstructed At Home from accessing capital markets or aligning with a strategic partner, and the fact that Cox and Comcast refused to enter new MDAs and planned to end their relationships with At Home. (PTAC ¶¶ 75(e), 103.)

not actionable under the securities laws.  See Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004); In re Duane Reade Inc. Sec. Litig., No. 02 Civ. 6478 (NRB), 2003 WL 22801416, at *4 (S.D.N.Y. Nov. 25, 2003) ("A company's statements of hope, opinion, or belief about its future performance or general market conditions are not actionable under the securities laws."), aff'd sub nom. Nadoff v. Duane Reade, Inc., 107 Fed. Appx. 250, 252 (2d Cir. 2004) (summary order).

Similarly non-actionable, because of their vagueness and generality, are McEachen's April 23, 2001 statement in Business Wire that "We performed very well in our core broadband operations, which now make up nearly two-thirds of our total revenue" (PTAC ¶ 97) and Mr. Bell's April 17, 2001 statement that "Our core broadband business is strong."  Id.

**5. March 2000 Agreements**

The PTAC alleges several fraudulent acts related to the March 2000 agreements between At Home and its cable partners.

The claim that AT&T's acquisition of a 74% voting interest in At Home violated Section 10(b) because it allowed the AT&T defendants to further their scheme to take At Home's proprietary technology (PTAC ¶ 61(e)) must be rejected because the PTAC does not allege that that transaction was independently fraudulent and, as discussed above, the undisclosed misappropriation of At Home's proprietary technology cannot alone support a federal

-34-

securities fraud claim.

In March 2000, AT&T allegedly represented that it would execute a new non-exclusive MDA covering its relationship with At Home from June 4, 2002 through June 4, 2006 as promptly as practicable.[15]    (PTAC ¶¶ 59(t), 62, 119(A)(5).)    That representation was allegedly fraudulent because AT&T had no intention of executing a new MDA or continuing its relationship with At Home.  Although the 1996 MDA between At Home and AT&T provided that it would remain in effect through June 2002, plaintiffs claim that the failure to execute a new MDA after March 2000 caused At Home's stock price to fall:  "According to defendant Bell, this tactical, on-going failure to achieve any amended MDA concerned market analysts and participants during 2000 and reduced the price of At Home's stock during 2000." (PTAC ¶ 118(B).)

Accepting the proposition that there could be such a market perception, plaintiffs point to no fact (such as an analyst's report or investor communication) evincing that there actually was.  Plaintiffs plead no fact which, if proven, would indicate that the gradual decline in At Home's stock price during all of 2000 was caused by any concern about the absence of a new MDA,

---

[15]  The PTAC also alleges that Cox and Comcast misrepresented their intentions to enter new MDAs with At Home in March 2000. (PTAC ¶¶ 62, 119(A)(5).)  Those alleged misrepresentations need not be considered as bases for liability, however, because no Section 10(b) claim is asserted against them.

rather than other causes such as the contemporaneous market-wide Internet stock collapse. As the Supreme Court stated in Dura, "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." 125 S. Ct. at 1632. Therefore, plaintiffs have "'not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.'" Lentell, 396 F.3d at 174, quoting First Nationwide Bank, 27 F.3d at 772. Nor does the PTAC suggest any theory by which a loss attributable to such a market suspicion could be quantified. See supra pp. 32-33; Lentell, 396 F.3d at 174, 177.

**6. Cox's and Comcast's Undisclosed Intentions to End their Relationships with At Home**

The PTAC refers to several statements as misrepresenting the strength of At Home's relationship with Cox and Comcast. Only two such statements survive my order dated September 17, 2003. The first is Mr. McEachen's statement in the June 19, 2001 investor and analyst conference call. Responding to a question whether Cox and Comcast would revoke their business relationships with At Home, Mr. McEachen stated that "'There isn't going to be one day where we wake up in a different world

and all of the co-branded Subs that we have with both of these great partners are going to migrate over to somebody else. That won't happen." (PTAC ¶ 102.) That statement was allegedly false and misleading because by that time both Cox and Comcast (1) had told At Home that neither had any interest in any future relationship with At Home, (2) were seeking to obtain At Home's technology to offer broadband services themselves and (3) also on June 19, 2001, notified At Home that they were terminating certain exclusivity provisions in their 1996 MDAs with At Home effective December 4, 2001. (PTAC ¶ 102.)

However, the PTAC does not allege that Cox or Comcast stopped doing business with At Home or provided high-speed Internet services on their own during the class period. Nor did the market learn of Cox's and Comcast's intentions to do so. McEachen's June 19, 2001 statement must therefore be dismissed for failure to plead loss causation. Lentell, 396 F.3d at 173.

The PTAC also alleges that At Home's statement that, "our cable partners may determine in the future that they can provide broadband services themselves, rather than offering our services" in its Form 10-K filed April 2, 2001 was false or misleading in light of Cox's and Comcast's intentions to end their relationships with At Home and to provide aspects of At Home's services themselves. (PTAC ¶ 95.) There is no allegation, however, that any of At Home's cable partners

actually provided broadband services themselves during the class period.  At most, there was a risk that they might do so in the future, which is the risk of which At Home warned.  Thus, that statement must be dismissed as a basis for liability.

**Section 20(a) Claims**

"In order to establish a _prima facie_ case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998), quoting SEC v. First Jersey Sec. Inc., 101 F.3d 1450, 1472 (2d Cir. 1996).

The control person claims under Section 20(a)[16] asserted against all defendants are premised on a primary violation of Section 10(b) by At Home.  (PTAC ¶¶ 130-132.)  Because all

---

[16] Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

claims of primary liability have been dismissed, the Section 20(a) claims must also be dismissed. Rombach, 355 F.3d at 177-78.

## CONCLUSION

For the reasons above, (1) defendants' motions dated September 2, 2005 to dismiss the first amended complaint are granted, (2) plaintiffs' motion dated May 31, 2005 for leave to file a second amended complaint is denied and (3) plaintiffs' motion dated August 5, 2005 for leave to file a third amended complaint is denied.

The Clerk will enter judgment dismissing all the complaints in this and the consolidated and related actions and dismissing as moot all other pending motions, with costs and disbursements to defendants according to law.

So ordered.

Dated: New York, NY
       March 23, 2006

*louis L. Stanton*

LOUIS L. STANTON
U.S.D.J.